IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **TRAVIS D. WESTON** | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 9765 |
| | ) | |
| v. | ) | |
| | ) | Judge Elaine E. Bucklo |
| **RICK HARRINGTON** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Petitioner Travis Weston brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For all the reasons that follow, his petition is denied.

In 2009, petitioner and his brother, Brian Weston, were tried simultaneously before different juries in the Circuit Court of Cook County, Illinois, for murder and attempted murder. Following trial, both petitioner and his brother were convicted of the April 30, 2005, murder of Tai Williams and the attempted murder of Nyoka Williams, who survived and testified at trial against both defendants. The trial court sentenced petitioner to consecutive terms of imprisonment of forty-five and thirty years.

---

[1] Rick Harrington has replaced Michael Atchison as warden of the Menard Correctional Center and thus is substituted as the respondent in this action.

After his appeals were unsuccessful, petitioner filed a timely *pro se* § 2254 petition, raising three claims: (1) the trial court erred in admitting evidence of petitioner's membership in a street gang and the court of appeals erred in its analysis of the prejudicial effect of that evidence; (2) petitioner was deprived of due process when the prosecution made disparaging comments directed at the defense during closing arguments; and (3) the appellate court failed to consider the cumulative effect of the trial court's errors when it upheld petitioner's conviction.

I.

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), I presume that the factual determinations of the state court are correct. 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029 (2003). Accordingly, the following summary of the relevant facts is derived from *People v. Weston*, 956 N.E.2d 498, 500-02 (Ill. App. Ct. 2011), in which the highest state court to decide petitioner's claims on the merits upheld his conviction and sentence.

Nyoka [Williams] testified that in 2004, she began dating William Yelvington, whom she knew as William Jackson. Yelvington introduced Nyoka to his cousin, [petitioner]. Nyoka interacted with [petitioner] on 10 or 11 separate occasions, including the times she accompanied Yelvington to [petitioner's] residence. In September 2004, Nyoka and Yelvington ended their relationship. Nyoka moved in with her sister Tai [Williams] and Tai's young son on East 50th Place in Chicago. Nyoka resumed dating Yelvington in early 2005, but recurrent arguments soon ended the relationship. Around April 4, 2005, Nyoka came home to find Yelvington and [petitioner] in her bedroom with multiple "long" guns laid out on her bed. She asked Yelvington to remove the guns, which he did. On April 11, 2005, Yelvington broke into her apartment through a window and refused her requests to leave. Yelvington pointed a long gun at Nyoka, threatening to kill her if she called the police. She ignored the threat and called 911, which prompted Yelvington to run out of the apartment. She recognized the long gun Yelvington pointed at her as among the guns he had laid out on her bed the week earlier. Nyoka obtained an order of

3

protection that barred Yelvington from entering her building.

On April 12, 2005, the police recovered a number of weapons and ammunition from a dumpster about a block from Nyoka and Tai's residence. There were two 12-gauge pump-action shotguns and three rifles, one of which had a bipod support stand attached to the barrel. The police search for weapons was triggered by an anonymous phone call. In an interview with Chicago Detective Jean Romic on May 4, 2005, Nyoka recognized from a photo the rifle with the bipod as the gun Yelvington pointed at her on April 11.

On April 29, 2005, Nyoka was home with her sister Tai. Nyoka was watching television in her bedroom while Tai was watching television and talking on the phone in the living room. The doorbell rang. The man at the intercom said he lived across the hall and needed to be let in. Nyoka told the man to contact the landlord. She observed through a window that the person at the intercom was a young black man in a gray, hooded sweatshirt. She told Tai she did not feel safe. She

checked the locks to the apartment and fell asleep in
her room on top of her bed covers with both the
television and a closet light on.

In the very early morning, Nyoka awoke to a man
standing directly over her, holding a silver gun with a
white handle in her face.  It looked like a "cowboy"
gun to Nyoka.  The man was wearing a gray, hooded
sweatshirt, had "short, nappy afro" hair, and was about
5 feet 6 inches or 5 feet 7 inches in height.  He
yelled, "where those things at."  When Nyoka sat up,
[petitioner] walked into her bedroom with Tai, who sat
next to Nyoka on the bed.  The man with the gun
continued to ask, "where is William's guns at."  Nyoka
responded that she did not know what the man was
talking about; she said Yelvington had taken all of his
possessions when he moved out of her apartment.
[Petitioner] left the room for a couple of seconds,
during which time Nyoka testified the man with the gun
was "steady asking me where the fuck is William's guns
at."  The defendant returned to the room with two
pillows from Nyoka's couch.  He addressed Nyoka by her
nickname, "Cookie, where the fuck them things at."  She

responded, "Travis, you know that William took
everything with him."

When Tai began repeating what Nyoka said, the gunman
threatened to shoot her for talking too loudly.
[Petitioner] attempted to put one of the pillows over
Tai's face, while the gunman aimed the gun at her face.
Nyoka then stood up, which prompted the gunman to hit
her in the face with the gun, shove her to the floor,
and shoot her in the back of the head.  Nyoka heard her
sister scream, "my arm, my arm," and heard two more
shots.  While Nyoka was lying on the floor, she heard
[petitioner] say, "shoot that bitch again," at which
point Nyoka was shot in the shoulder.  After the two
men left, Nyoka called 911 on her cell phone.  She was
hospitalized with two through-and-through gunshot
wounds: one to the base of her skull at her neck; the
other to her left upper shoulder.  Tai died from the
gunshots [sic] wounds she received.

*Weston*, 956 N.E.2d at 500-01.

When police arrived on the scene, the rear door of the
apartment had been forced open.  Chicago police officer Carl
Brasic recovered two bullets from the residence but no guns.  On

May 3, Nyoka identified petitioner from an array of 11 photographs, and the next day she identified petitioner from a lineup at the police station. Nyoka later identified petitioner's brother, Brian Weston, from a photo array.

At trial, Rannell Colbert, a friend of petitioner's also testified for the prosecution. In April 2005, petitioner was sleeping at Colbert's residence on her sofa. Colbert knew petitioner's cousin, Yelvington, and she knew him by the name of "LC."

> Around mid-April, [petitioner] said to Colbert, "'Sis, I might need you to beat LC's bitch up for me.'" When Colbert asked why, [petitioner] said, "'man, that bitch turned some thumpers in to the peoples.'" [Petitioner] added, "'if they catch LC, man, my cousin going to be gone for life. They going to slam him.'" According to Colbert, "thumpers" meant guns and "LC's bitch" referred to the woman LC was dating. On the day before the shooting, Colbert went to a party around 9:30 p.m. [Petitioner] was not home when she returned around 2:30 or 3 a.m. the next day. He was not there when she awoke at noon. She went to another party the night of April 30. When she came home around 3 a.m., [petitioner] was home. When she asked where he had

been, [petitioner] responded that he had been "hanging

out."  At some point that morning, [petitioner] walked

through Colbert's house putting his belongings in a

plastic bag and left.

*Weston*, 956 N.E.2d at 502.  The parties stipulated to the DNA

evidence, which was that petitioner and his brother had been

excluded as contributors to the DNA sample recovered from under

Tai's fingernails.

Just prior to trial, the prosecution moved to admit evidence

that petitioner was a member of the Unknown Vice Lords gang.

According to the prosecution, this evidence of gang affiliation

was relevant to show motive, the government's theory being that

petitioner sought to recover the weapons cache of a fellow gang

member (his cousin, Yelvington) or weapons belonging to the gang

itself.  Counsel for petitioner argued that the familial

relationship between petitioner and Yelvington provided a motive

and that the prosecution had not proven that the act itself had

to do with any gang affiliation.  The trial judge ruled for the

prosecution, concluding that the evidence "would be more

probative than prejudicial to [petitioner]."  *Weston*, 956 N.E.2d

at 502.

Pursuant to the trial judge's ruling,

Nyoka testified [petitioner] and Yelvington addressed
each other as "Lord," which she understood to mean
"Vice Lord."  When Colbert was also asked about
[petitioner's] gang membership, she testified, "I
didn't never known for Travis to belong to a street
gang. * * * [J]ust the environment of which I knew he
hung out in, I do know that was gang related."  When
asked what environment she referred to, she explained,
"I known some of them to say Unknown Vice Lord," which
she identified as the name of the street gang.

*Weston*, 956 N.E.2d at 502-03.  And during closing argument, the
prosecution brought up the gang evidence again, stating:

Guns in the world of gangs have attachments,
attachments not only to crimes, like to this crime,
like the gun that this defendant and his brother, his
partner in crime used to extinguish Tai's life and to
try to kill Nyoka, they not only have those connections
to crimes, they have connections to other crimes
because they can be matched up back to things that
happened years ago, back to things that happened
yesterday, back to things that happened two hours ago.

(State Ct. Record, Ex. N, at MM-72).

The jury found petitioner guilty of first degree murder and attempted murder.

## II.

Under the AEDPA, a habeas petitioner is not entitled to a writ of habeas corpus unless the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362, 367, 120 S.Ct. 1495 (2000). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams*, 529 U.S. at 405, 120 S.Ct. 1495. To demonstrate an "unreasonable application" of clearly established federal law, a habeas petitioner must establish that the state court unreasonably applied the controlling legal rule to the facts of the case. *Id.* at 407. The state court's application of Supreme Court precedent must be more than incorrect or erroneous. Rather, it must be "so erroneous that there is no possibility fairminded jurists could disagree that

the state court's decision conflicts with [Supreme Court] precedents." *Nevada v. Jackson*, 569 U.S. ----, 133 S.Ct. 1990, 1992 (internal quotation marks and citation omitted); *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003) (state court's application of established law must be "objectively unreasonable").

Before a federal court will consider a habeas corpus petition, a petitioner must satisfy several requirements, including the exhaustion of state remedies and the avoidance of procedural default. Procedural default refers primarily to two situations. The first occurs when the petitioner presents federal claims in his habeas petition that he did not "fairly present" to the state courts, thereby depriving the state courts of the first opportunity to address the claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45, 119 S.Ct. 1728 (1999). A petitioner's failure to fairly present each habeas claim to every level of the state courts in the time and manner required leads to a default of the claim, thus barring a federal court from reviewing the claim's merits. *Id.* at 848, 119 S.Ct. 1728. The second occurs where the state court bases its judgment on a finding of procedural default or waiver under state law, where such grounds are "independent of the federal question and adequate to support the judgment." *Franklin v. Gilmore*, 188 F.3d

877, 881 (7th Cir. 1999). A federal court, however, may excuse a procedural default if a petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546 (1991).

*Erroneous Admission of Gang-related Evidence*

The appellate court has already determined that the trial court erred in admitting the gang-related testimony of Nyoka and Colbert. *Weston*, 956 N.E.2d at 507. In so ruling, the court of appeals noted that the record was "barren of any evidence that the weapons [petitioner and his brother were looking for] belonged to the gang." *Id.* at 506. Further, the court found that the prosecution's claim that the gang-related evidence was necessary "to provide a motive for an otherwise *inexplicable act*," was simply not true in light of the fact that the state had recognized in closing arguments that the familial relationship was the primary motivation for the commission of the crime. *Id.* (citation omitted) (emphasis in original).

Despite this conclusion, the appellate court held that even though the admission of gang-related testimony was in error, that error was "rendered harmless beyond a reasonable doubt in light

of the overwhelming evidence that proved [petitioner's] guilt beyond a reasonable doubt." *Id.* at 509. Petitioner claims that he has been deprived of his rights under the Sixth and Fourteenth Amendments because the appellate court (a) employed the incorrect standard in determining that the trial court's error was a harmless one, and (b) did not consider that the erroneous admission of the gang-related testimony was exacerbated by the prosecution's use of that evidence in its rebuttal during closing arguments. Defendant's primary argument is that the appellate court employed a "sufficiency of the evidence" standard rather than the required "reasonable doubt" standard.[1]

---

[1]  Petitioner attempts to evade the procedural default issue by tying his claim of prosecutorial misconduct to his claim regarding the erroneous admission of gang-related evidence. However, these are two separate issues that, while related to a limited extent, require distinct analyses. As the state appellate court understood (and, indeed, as petitioner argued on appeal), petitioner is making two separate claims. First, he claims that the trial court's error in admitting the gang-related evidence was not harmless. Second, petitioner claims that, even if the state appellate court reasonably conducted the harmless-error analysis, prosecutorial misconduct (inflammatory references to gangs and "ridicule" of the defense's arguments) amounts to constitutional error requiring issuance of the writ. To the extent that petitioner argues in my harmless-error analysis I must consider at least the prosecutorial misconduct claim as it relates inflammatory references to gangs or gang-related evidence, he is mistaken. It is not merely the prosecution's reference to the gang-related evidence that gives rise to petitioner's claim: It is the purportedly inflammatory nature of the prosecution's references to gangs that petitioner objects to. For this reason, the prosecutorial misconduct and harmless-error analysis constitute two separate issues.

Because the appellate court has ruled on the merits of petitioner's claims regarding the admission of the gang-related evidence, the role of this court is a limited one.

> If the state court has conducted a harmless-error analysis, the federal court must decide whether that analysis was a reasonable application of the *Chapman* [*v. California*, 386 U.S. 18, 87 S.Ct. 824 (1967)] standard. If the answer is yes, then the federal case is over and no collateral relief issues. [. . .] If the answer is no—either because the state court never conducted a harmless-error analysis, or because it applied *Chapman* unreasonably—then § 2254(d) drops out of the picture and the federal court must make an independent decision, just as if the state court had never addressed the subject at all.

*Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009). Here, the state court did conduct a harmless-error analysis, and I must ask whether that analysis was a reasonable one.

The state appellate court accurately articulated the reasonable doubt standard as laid out in *Chapman*. *See Weston*, 956 N.E.2d at 508. Further, its application of that rule was a reasonable one. The state court of appeals found the gang-related evidence to be irrelevant, and considered the evidence to

14

be "overwhelming" in favor of petitioner's guilt, despite the
absence of inculpatory physical evidence.  *Id.*  The court
concluded that Nyoka's testimony, Colbert's testimony, and
testimony corroborating the recovery of Yelvington's cache of
weapons in a dumpster near Tai's apartment together proved
petitioner's guilt beyond a reasonable doubt and rendered the
gang-related evidence harmless.  *Id.* at 508-09.  As for the
strength of Nyoka's testimony, the court of appeals found
petitioner's challenges to her credibility to be "insubstantial."
Indeed, the state appellate court found that "Nyoka's intrepid
character came through in her testimony, which might well have
constituted overwhelming proof of [petitioner's] guilt in the
absence of any other incriminating evidence."  *Id.*  Having
reviewed the trial transcripts and the record, I cannot conclude
that the state court's resolution of the harmless-error analysis
was unreasonable.


*Prosecutorial Misconduct: Comments During Closing Arguments*

As described above, the prosecution made arguments based on
the gang-related evidence in its rebuttal during closing
arguments.  In addition, the prosecution attacked certain of the
defense's arguments.  At various points during its rebuttal, the
prosecution called defendant's arguments "nonsense," "just

ridiculous," "asinine," "hogwash," and "psycho babble."  Defense counsel made two objections during rebuttal, but neither of these objections was made in response to the prosecution's references to gangs or the gang-related evidence.  With each objection, the trial court admonished the prosecutor to "refrain from stating personal opinions or beliefs" and reminded the jury not to consider any personal opinions of the lawyers.  (*See, e.g.*, State Ct. Record, Ex. N, at MM-81).  Petitioner did not raise any issue based on the closing arguments in his post-trial motions.

On appeal, the state appellate court treated petitioner's claim that he was substantially prejudiced by the prosecution's comments during closing arguments as having been waived.  Noting that under Illinois law, "[t]o preserve an issue for appeal, a defendant must both object at trial and raise the issue in his posttrial motion," *Weston*, 956 N.E.2d at 509 (citing *People v. Woods*, 828 N.E.2d 247, 256-57 (Ill. 2005)), the state appellate court went on to analyze whether petitioner's claim fell under the "plain error" exception, under which a reviewing court is permitted to address the merits of an unpreserved error.  *Id*.

Respondent now argues that petitioner's claim has been procedurally defaulted, as it was rejected on an independent and adequate state law ground.  "When the last state court to issue an opinion on a petitioner's federal claim has resolved that

claim on an adequate and independent state ground, federal habeas review of the claim is foreclosed." *Miranda v. Leibach*, 394 F.3d 984, 991 (7th Cir. 2005). There is, however, an exception to the adequate and independent state ground doctrine: "If the petitioner can demonstrate cause for his failure to comply with the state rule and prejudice resulting from the default, or alternatively that a miscarriage of justice will occur if he is not granted relief, then a federal court may reach the merits of his claim." *Id.* at 992 (citing *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038 (1989)).

Under Illinois law, "a convicted defendant [must] include any and all claims of error in a post-trial motion for a new trial." *Id.* (citing ILCS 5/116-1; *People v. Enoch*, 522 N.E.2d 1124, 1129-30 (Ill. 1988)). Failure to comply results in waiver of the claim and limits a state court's review of the claim to one for plain error. *Id.* (citing Illinois Supreme Court Rule 615(a)). Petitioner does not argue that he did, in fact, preserve his claims regarding the prosecution's statements during closing arguments as required by state law. Instead, petitioner argues that because the state appellate court conducted a plain error review of his claim, it reached the merits and, essentially, cured the waiver. However, plain error review is simply part and parcel of the waiver analysis, and it is the

state court's determination that the claim has been waived that bars review in federal court. In any case, the fact that a state court also addresses a claim on the merits does not alter its finding of waiver. *See Burris v. Farley*, 51 F.3d 655, 660 (7th Cir. 1995) (a "dual-ground decision" is insulated from federal review).

Petitioner also argues that even if the Illinois waiver rule would apply to his case, it is not adequate because it is not strictly or regularly followed. The Seventh Circuit, however, has rejected this argument and has concluded that Illinois' waiver rule constitutes an adequate and independent ground, even in light of disagreement among the courts of appeals in terms of exceptions to the rule. *Miranda*, 394 F.3d at 996-97 (rejecting the argument that inconsistent application of Illinois' waiver rule renders the rule inadequate for purposes of the procedural default inquiry).

Because petitioner's prosecutorial misconduct claim is procedurally defaulted pursuant to adequate and independent state grounds, I may not reach the merits unless petitioner can demonstrate cause and prejudice or actual innocence. Petitioner has not argued that he can establish an equitable exception that would permit me to reach the merits of his claim despite the

18

procedural default.  As a result, federal review of this claim is barred.

*Cumulative error*

Petitioner also claims that the cumulative effect of the trial court's errors requires issuance of the writ.  "The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error."  *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000) (quoting *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc)).  First, this claim is procedurally defaulted as he never raised it below at trial or on direct appeal.  Further, to demonstrate cumulative error, a petitioner must establish that at least two errors were committed during the course of the trial.  *United States v. Moore*, 641 F.3d 812, 830 (7th Cir. 2011).  Here, petitioner has established only one error, the trial court's erroneous admission of gang-related evidence.  Petitioner therefore cannot demonstrate cumulative error.  I would further note that the cumulative error claim demonstrates why waiver is appropriate in this case.  Because petitioner never objected to or moved post-trial to correct the purportedly inflammatory gang references during the prosecution's rebuttal argument, the trial court never had an opportunity to

address this alleged error or to correct any perceived cumulative effects.

## III.

For the foregoing reasons, Weston's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied.

## IV.

Upon entering an order denying habeas relief, a district court should also determine whether a certificate of appealability is warranted. *See* Habeas Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). To obtain a certificate of appealability, a petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court denies a habeas petition on procedural grounds, without reaching the merits of the underlying constitutional claims, the petitioner must show not only that jurists of reason would find it debatable whether petitioner has alleged at least one meritorious claim, but also that jurists of reason would find the procedural ruling debatable. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). With respect to my conclusion that petitioner's second and third

claims are procedurally defaulted, I do not conclude that those rulings are debatable among jurists of reason. Likewise, with respect to the remainder of my conclusions concerning petitioner's first claim, I do not conclude that jurists of reason would find those conclusions debatable.


Date: July 24, 2013

_____
Hon. Elaine E. Bucklo
U.S. District Judge